UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————

JILLIAN KRISTEN NATHAN,

    Plaintiff,        Case No.
                Hon.
vs.

PANGEA MADE, INC., *a Delaware corporation*;
formerly known and doing business as
GST AUTOLEATHER, INC., *a former Delaware corporation*,

    Defendants.
_____/

 James C. Baker (P62668)
 Attorney for Plaintiff
 STERLING ATTORNEYS AT LAW, P.C.
 33 Bloomfield Hills Pkwy., Ste. 250
 Bloomfield Hills, MI 48304
 (248) 644-1500
 jbaker@sterlingattorneys.com

_____/

# COMPLAINT AND JURY DEMAND

  Plaintiff, Jillian Kristen Nathan, by her attorney James C. Baker of Sterling Attorneys at Law, P.C., for her Complaint and Jury Demand against Defendants, submits the following:

## JURISDICTION AND PARTIES

1. This is an action for disability discrimination and retaliation in violation of the Americans with Disabilities Act of 1990, 42 USC 12111 *et seq.*, for disability discrimination and retaliation in violation of the Michigan's Persons with Disabilities Civil Rights Act, MCL 37.1101, *et seq.*, and for race discrimination in violation of 42 USC 1981 and the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*, all arising out of Plaintiff's employment relationship with Defendants.

2. Plaintiff Jillian Kristen Nathan is a resident of Birmingham, Oakland County, Michigan, within the Eastern District of Michigan.

3. Defendant Pangea Made, Inc. ("Pangea") is a Delaware corporation authorized to transact and conduct business in Michigan, that maintains a principal place of business in Rochester Hills, Oakland County, Michigan, within the Eastern District of Michigan.

4. Pangea was formerly known as and did business as GST AutoLeather, Inc., a former Delaware corporation, which to the extent GST AutoLeather, Inc. remains an incorporated entity, it is wholly owned by Pangea.

5. The events giving rise to this cause of action occurred within the Eastern District of Michigan.

6. This Court has subject matter jurisdiction of Plaintiff's claims pursuant to 28 USC 1331 (federal question), 28 USC 1343 (civil rights) and 28 USC 1367 (supplemental jurisdiction).

7. Plaintiff timely files this Complaint within 90 days of receiving her EEOC right to sue notice wherein the EEOC found reasonable cause to believe Defendants violated the Americans with Disabilities Act of 1990, 42 USC 12111 *et seq.* with regard to the terms and conditions of Plaintiff's employment; the right to sue was issued on June 27, 2022.

## BACKGROUND FACTS

8. Plaintiff is an African-American woman.

9. Plaintiff became Defendants' employee on August 27, 2018 and was involuntarily terminated from her employment by Defendants on February 26, 2021.

10. Plaintiff's job title was Sales and Marketing Specialist.

11. When she onboarding, Defendants specifically remarked about Plaintiff's ability to effectively communicate "being a diversity candidate."

12. Such a comment connotes that her race was a factor in her employment.

13. While employed, Plaintiff was one of a handful of African-American employees in an overwhelmingly Caucasian workforce.

3

14. Plaintiff has a medically-diagnosed "Reactive Airway Disease" from which she has suffered an extensive history of ear, nose, and throat issues.

15. The "Reactive Airway Disease" is a disability pursuant to the Americans with Disabilities Act of 1990 and the Michigan Persons with Disabilities Civil Rights Act.

16. Defendants were and are aware of Plaintiff's "Reactive Airway Disease."

17. With the onset of the COVID-19 pandemic in early 2020, Plaintiff and her treaters became increasingly concerned that she would be especially susceptible to long-term harms from virus.

18. As an African-American, Plaintiff was at a higher risk of medical harms from COVID-19.

19. In early 2020, Defendants instructed many of its employees to work from home due to the COVID-19 pandemic; Plaintiff was one of those instructed to work from home.

20. While working remotely, Plaintiff performed her job duties successfully.

21. In May 2020, Defendants implemented a plan to return employees to in-person work, including ordering Plaintiff to return in-person.

22. Plaintiff communicated in writing and by telephone to human resources and her manager that she had concerns over how COVID-19 and a

4

physical return to work would adversely impact her disability, her Reactive Airway Disease.

23. Plaintiff also communicated that Defendants' ordered return to work were perceived violations of Michigan's "Stay Home, Stay Safe" mandates.

24. In May 2020, Plaintiff requested a reasonable accommodation with medical support provided by her healthcare providers; the accommodation was to allow her to continue to work remotely.

25. Specifically, her ENT physician wrote on May 29, 2020: "To whom it may concern: I do not believe Jillian would be safe to return to work. Her reactive airway disease would put her at great risk of covid complication. She should work from home."

26. On June 8, 2020, Defendants advised Plaintiff to take Emergency Paid Sick Leave under the Families First Coronavirus Response Act.

27. Because the Emergency Paid Sick Leave was for 80 hours only, or two weeks of work, and because Defendants' response did not address Plaintiff's requested accommodation requested, Plaintiff provided Defendants with an additional note from her physician on July 2, 2020 stating: "It is my recommendation that her employer make accommodations for her. She should either be allowed to work from home (ideally) or she should be confined to a work area that is separate from her coworkers so that she can remove her mask.

5

This is the less preferred option due to her chronic cough and the risk of unknowingly transmitting COVID 19."

28. Concurrently, Plaintiff expressed she was not opposed to reporting in person on occasions that were necessary (e.g., headshot and photoshoot project lead and implementor activities).

29. Defendants ordered Plaintiff to report to work in-person, and offered tables at the back of the design area; the tables were not confined, and tables were in a space frequented by contractors.

30. Plaintiff would have been in contact with dust, other allergens, construction noise and contractors that did not always wear masks; all of these would aggravate her respiratory challenges and continue to put her at risk.

31. Plaintiff was aware, and informed Defendants, that vacant and enclosed offices with doors and ceilings were available.

32. The enclosed offices were the less-preferred recommendation made by Plaintiff's physician, but could have met Plaintiff's requested accommodation when it was necessary that she report in-person to work.

33. Plaintiff was informed the vacant offices were reserved for "senior leadership."

34. Instead, Defendants offered her an open cubicle that was not be confined.

35. Neither option – the desk in the design area nor the open cubicle – were responsive or addressed Plaintiff's medically-supported requests for reasonable accommodations.

36. Plaintiff was relegated to work inside an unconfined cubicle, where, if necessary, she would also have to use public unconfined facilities (such as the restroom facilities) which were heavily trafficked by non-disabled employees.

37. During this time there were reports of positive cases of COVID-19 in Defendants' workplace, without any plan implemented to address those positive cases and those employees like Plaintiff who were at higher risk of serious adverse consequences if the contracted coronavirus.

38. To avoid exposure which could trigger her Reactive Airway Disease, including avoiding exposure to COVID, Plaintiff was forced to leave work daily to eat her lunch at home, as well as travel to and from work to home whenever she had to use the restroom.

39. These trips were between 15-20 minutes each way; the alternative was to expose herself to physical harm; had her requested accommodations been granted, had she been allowed to perform her duties remotely, such interruptions would not have been necessary.

40. Because her accommodation request was denied, in an effort to protect herself as much as possible in the workplace, Plaintiff wore an N95 mask, a face shield, and gloves throughout the day; these caused Plaintiff to have

7

difficulty breathing during the summer months, and acne and skin lesions developed that were treated by her dermatologist, as such Plaintiff suffered anxiety for which she sought treatment.

41. Because of the refusal to make reasonable accommodations, in September 2020 Plaintiff contacted the EEOC, and in later November she contacted MIOSHA.

42. On November 30, 2020, Plaintiff received communication replying to her multiple and continued requests to work from home.

43. Defendants maintained its order that Plaintiff continue to report in person, claiming that business needs required her to be present and available for work and for regular discussion, follow up, project reporting and assessment.

44. What Defendants claimed were requiring Plaintiff's physical presence were things Plaintiff did successfully while remote, and were things Plaintiff could continue to do remotely.

45. Most of the people that Plaintiff worked with were outside vendors or were not based in the Rochester Hills facility.

46. Plaintiff's job duties were all things that had been, and could continue to be performed remotely or by phone without issue.

47. On December 18, 2020, Defendants emailed all staff stating: "our business is strong and we ARE winning."

48. Shortly thereafter, on January 21, 2021, Defendants ordered Plaintiff to work from home.

49. The office speculation was that Defendants were struggling with positive cases came from varying levels of staff, as Defendants seldom informed employees, including Plaintiff, of positive COVID-19 cases.

50. Later Plaintiff became independently aware of at least 8 positive cases in the Rochester Hills facility, at least two of which resulted in hospitalizations.

51. Despite being aware of Plaintiff's disability, Defendants never informed her of these outbreaks.

52. On or about February 26, 2022, citing a purported economic reduction in force, Defendants terminated Plaintiffs' employment.

53. Plaintiff is aware that she and another African-American employee had been terminated as part of the reduction in force.

54. Plaintiff was the only employee with a disability terminated.

55. The purported reduction in force occurred shortly after the CEO reported to all staff that Defendants' "business is strong and we ARE winning."

56. The reduction in force was pretext for disability discrimination, was retaliatory against Plaintiff for her seeking reasonable accommodations for her medical disability, was retaliatory for Plaintiff reporting internally and

externally of the discrimination she suffered because of her disability, and her race was a factor in Defendants' decision to purportedly eliminate her position.

## COUNT I

## DISABILITY DISCRIMINATION AND RETALIATION – ADA

57. Plaintiff incorporates the preceding paragraphs by reference.

58. Plaintiff is person with a disability as defined in the Americans with Disabilities Act, 42 USC 12101, *et seq*.

59. At all relevant times, Plaintiff was an employee and Defendants were her employers as defined by the ADA.

60. As a person with a disability, Plaintiff was able to perform her job successfully albeit with reasonable accommodations, which Plaintiff requested of Defendants in writing, providing medical evidence of her disability and support for the accommodations requested.

61. Defendants discriminated against Plaintiff as set forth above due to Plaintiff's disability, and refused to accommodate Plaintiff's disability.

62. The accommodations sought by Plaintiff were reasonable, the accommodations were available to Defendants, and the accommodations did not impose an unreasonable burden on Defendants.

63. Defendants failed in good faith to participate in an interactive process regarding Plaintiff's request for accommodation.

64. Defendants treated similarly situated employees who did not have disabilities more favorably than plaintiff.

65. The discriminatory practices at issue were intentional and willful, and engaged in with malice or with reckless indifference to the rights and sensibilities of Plaintiff.

66. Defendants wrongly terminated Plaintiff in retaliation for Plaintiff being a person with a disability, in retaliation for Plaintiff requesting reasonable accommodations, and in retaliation for Plaintiff reporting internally and externally that Defendants were discriminating against her because of her disability.

67. As a direct and proximate result of Defendants' wrongful, intentional, discriminatory, and retaliatory treatment of Plaintiff, she has suffered injuries and damages, including but not limited to, loss of past, present, and future earnings and earning capacity; loss of the value of fringe and pension benefits; mental and emotional distress, including anxiety and mental anguish, humiliation and embarrassment; and the loss of the ordinary pleasures of everyday life, including the right to seek and pursue gainful employment.

## COUNT II

### MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT VIOLATION

68. Plaintiff incorporates the preceding paragraphs by reference.

69. Plaintiff was an employee and Defendants were her employers covered by and within the meaning of Michigan's Persons with Disabilities Civil Rights Act, MCL 37.1101, *et seq.*

70. Plaintiff is a person within a disability as defined by the Act.

71. Plaintiff was qualified for her position.

72. As a person with a disability, Plaintiff was able to successfully perform her job with accommodations, which Plaintiff requested of Defendants, providing medical evidence of her disability and support for the accommodations requested.

73. Plaintiff's requests for reasonable accommodations were made in writing to Defendants.

74. Defendants discriminated against Plaintiff as set forth above due to her disability, and refused to accommodate Plaintiff's disability.

75. The accommodations sought by Plaintiff were reasonable, were available to Defendants, and did not impose an unreasonable burden on Defendants.

76. The discriminatory practices at issue were intentional and willful, and engaged in with malice or with reckless indifference to the rights and sensibilities of Plaintiff.

77. Defendants wrongly terminated Plaintiff in retaliation for Plaintiff being a person with a disability, in retaliation for Plaintiff requesting reasonable

accommodations, and in retaliation for Plaintiff reporting internally and externally that Defendants were discriminating against her because of her disability.

78. As a direct and proximate result of Defendants' wrongful, intentional, discriminatory, and retaliatory treatment of Plaintiff, she has suffered injuries and damages, including but not limited to, loss of past, present, and future earnings and earning capacity; loss of the value of fringe and pension benefits; mental and emotional distress, including anxiety and mental anguish, humiliation and embarrassment; and the loss of the ordinary pleasures of everyday life, including the right to seek and pursue gainful employment.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF 42 USC 1981

79. Plaintiff incorporates the preceding paragraphs by reference.

80. At all material times, Plaintiff was an employee and Defendants were her employers, covered by and within the meaning of 42 USC 1981.

81. Defendants engaged in discriminatory employment practices based on race.

82. Defendants treated Plaintiff differently, and subjected her to termination with race being a factor in her termination.

83. Defendants were predisposed to discriminate against Plaintiff on the basis of her race, and acted in accordance with that predisposition.

84. The discriminatory practices at issue were intentional and willful, and engaged in with malice or with reckless indifference to the rights and sensibilities of Plaintiff.

85. As a direct and proximate result of those actions, the terms, conditions and privileges of Plaintiff's employment were adversely affected, she was selected for a pretextual reduction in force, and she was terminated.

86. The purported reduction in force affected Plaintiff and another African-American employee, their race being a factor in them being selected.

87. As a direct and proximate result of the Defendants' wrongful and discriminatory treatment of Plaintiff, she has suffered injuries and damages, including, but not limited to, loss of past, present and future earnings and earning capacity; loss of the value of fringe and pension benefits; mental and emotional distress, including anxiety and mental anguish; humiliation and embarrassment; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue gainful employment.

## COUNT IV

### RACE DISCRIMINATION IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

88. Plaintiff incorporates the preceding paragraphs by reference.

89. At relevant times, Plaintiff was an employee and Defendants were her employers covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, MCL 37.2101, *et seq*.

90. Michigan's Elliott-Larsen Civil Rights Act prohibits discrimination on the basis of race.

91. Defendants treated Caucasian employees more favorably than Plaintiff.

92. Defendants' decision to eliminate Plaintiff's position as a purported reduction in force was made based on impermissible considerations of Plaintiff's race.

93. Defendants were predisposed to discriminate on the basis of race and acted in accordance with that predisposition.

94. Defendants' actions were intentional and engaged in with reckless disregard for Plaintiff's rights.

95. As a direct and proximate result of Defendants' wrongful and discriminatory treatment of Plaintiff, she has suffered injuries and damages, including but not limited to, loss of past, present, and future earnings and earning capacity; loss of the value of fringe and pension benefits; mental and emotional distress, including anxiety and mental anguish, humiliation and embarrassment; and the loss of the ordinary pleasures of everyday life, including the right to seek and pursue gainful employment.

## RELIEF REQUESTED

Wherefore, for the foregoing reasons, Plaintiff Jillian Kristen Nathan demands judgment against Defendants as follows:

    A.    Legal Relief:

        1.    Compensatory damages in whatever amount she is found to be entitled;

        2.    Exemplary damages in whatever amount she is found to be entitled;

        3.    Punitive damages in whatever amount she is found to be entitled;

        4.    Liquidated damages in whatever amount she is found to be entitled;

        5.    A judgment for lost wages and benefits in whatever amount she is found to be entitled;

        6.    An award of interest, costs and reasonable attorney fees; and

        7.    Whatever other legal relief appears appropriate at the time of final judgment.

    B.    Equitable Relief:

        1.    An injunction out of this Court prohibiting any further wrongful employment or other acts based on disability and/or race;

        2.    An award of interest, costs and reasonable attorney fees; and

        3.    Whatever other equitable relief appears appropriate at the time of final judgment.

**JURY DEMAND**

Plaintiff Jillian Kristen Nathan by her attorneys Sterling Attorneys at Law, P.C., requests a trial by jury.

        Respectfully submitted,

        STERLING ATTORNEYS AT LAW, P.C.

        By: /s/ James C. Baker
            James C. Baker (P62668)
            Attorney for Plaintiff
            33 Bloomfield Hills Pkwy., Ste. 250
            Bloomfield Hills, MI 48304
            (248) 644-1500
            jbaker@sterlingattorneys.com

Dated: September 22, 2022